IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNILEVER UNITED STATES, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16-CV-01849 |
| | ) | |
| JOHNSON CONTROLS, INC., | ) | |
| | ) | Jury Demanded |
| Defendant. | ) | |

## COMPLAINT

Plaintiff UNILEVER UNITED STATES, INC. ("Unilever"), through its attorneys, COTSIRILOS, TIGHE, STREICKER, POULOS & CAMPBELL, and for its Complaint against Defendant, JOHNSON CONTROLS, INC. ("JCI") states the following:

## NATURE OF THE ACTION

1. Unilever brings this breach of contract action against JCI for JCI's utter failure to meet its obligations under a June 1, 2013 Scope of Work and April 1, 2007 Master Services Agreement (collectively "the Contract") between the parties. Under the Contract, Unilever paid JCI approximately $52,968 per month to provide security and other services at the shuttered Alberto Culver Company campus in Melrose Park, IL while Unilever tried to sell the facility and equipment inside. JCI fell woefully short of its obligations under the Contract, and as result, the facility was ransacked at least three times – twice after JCI was fully aware of the first theft. Thieves stole over a million dollars in equipment and tools, crippling

Unilever's ability to sell the facility as a turnkey operation and causing Unilever millions of dollars in damages.

## PARTIES

2. Plaintiff Unilever is a consumer products company based in Englewood Cliffs, New Jersey. At all relevant times, Unilever owned the Alberto Culver Company campus in Melrose Park, IL.

3. Defendant, Johnson Controls Inc., is a diversified technology and industrial company with over 1,300 locations and 130,000 employees worldwide. JCI is headquartered in Milwaukee, Wisconsin. At all relevant times, JCI conducted business in the Northern District of Illinois.

## JURISDICTION AND VENUE

4. The Court has jurisdiction over this matter under 28 U.S.C. §1332 as there is complete diversity among the parties and the amount in controversy exceeds $75,000. 28 U.S.C. §1332(a)(1).

5. Venue lies in this District, as all the events or omissions giving rise to the claims occurred in this District. 28 U.S.C. §1391(b)(2).

## FACTS

6. In 2010, Unilever acquired the Alberto Culver Company for approximately $3.7 billion. With the purchase, Unilever also acquired Alberto Culver's 18.7-acre campus and 534,000 square foot manufacturing facility and offices, located at 2525 Armitage Ave. in Melrose Park, Illinois (the "facility").

7. On April 15, 2013, Unilever stopped production at Alberto Culver, and six weeks later, on May 31, 2013, Unilever fully closed the facility in Melrose Park.

8. In order to maximize the facility's resale value, Unilever planned to sell it as a turnkey manufacturing operation. Therefore, in order to keep the asset secure and its value preserved during the listing and sale process, Unilever hired JCI to provide security services.

9. According to its website, JCI serves 30% of Fortune 1000 companies and is "responsible for advanced security solutions in over 1 billion square feet of commercially leased property."

10. Since 2007, Unilever has had a Master Services Agreement ("MSA") with JCI under which JCI provides security and other services to various Unilever facilities. Per the MSA, "[t]he specific Services to be provided to each applicable facility of [Unilever] shall be detailed on separate Statements of Work to be executed by [JCI] and [Unilever] for each such facility." (Ex. 1, MSA between Unilever and JCI).

11. On June 1, 2013 the parties executed a Statement of Work ("SOW") applicable to the Alberto Culver facility. (Ex. 2, SOW between Unilever and JCI for 2525 W. Armitage, Melrose Park, IL.)

12. Among other duties, the SOW required JCI to provide Manned Guarding. (Ex. 2, SOW at §8.9). Section 8.9 of the SOW provides:

> **Work Statement**
>
> **Includes:** The primary purpose of security is to present a positive and professional security presence at the Facility. This presence includes

> performing the following duties: ensuring that only authorized individuals are allowed to access the Facility, signing in and directing visitors and delivery personnel, ensuring all established health and safety procedures are adhered to, monitoring and directing all incoming traffic in an expedient manner. Inspections of the parking lots and other perimeter locations are performed….

(Ex. 2, SOW at pg. 26).

13. The following tasks were explicitly included as "Expected Program Elements":

- 24/7 coverage, 1st shift, 2nd shift, and 3rd shift.
- Perimeter door control and lockdown as directed.
- Monitor alarm, card access and CCTV system.
- Once per shift physical check of perimeter doors to ensure they are secure.
- Once per shift physical check of office area doors to ensure they are secure {performed after normal working hours}.
- Monitor employee parking lot.
- Provide training for all new guards.

(Ex. 2, SOW at pp. 26-27).

14. In addition, JCI was required to "insure that all equipment [was] in safe working order, and presents no danger to [Unilever's] property." (Ex. 2, SOW at pg. 7). Specifically, the contract required JCI to maintain "all components and structures associated with Site door systems." (*Id.* at §3.3, pg. 12).

15. Section 7.1, Camera Monitoring and Recording System, required JCI to maintain "all components associated with the site camera monitoring and recording system." (*Id.* at §7.1, pg. 24).

4

16. JCI never even checked the alarm system for operability upon taking over responsibility for securing the facility.

17. JCI did nothing to ensure that the camera monitoring and recording system was operating properly. In fact, several cameras were inoperable, and many of the guards JCI assigned to the site had no idea how to operate the cameras.

18. JCI failed to secure the perimeter doors, permitting thieves to gain access to the facility and make off with the equipment inside.

19. Further, JCI failed to properly and regularly patrol the premises.

20. Despite its contractual obligations and instructions from the local police to monitor and secure the parking lots, JCI did nothing to prevent trespassers and vagrants from accessing the parking lots and thereby accessing the facility.

### The 2014 Theft

21. On August 23, 2013, a potential buyer toured the facility to view the grounds and equipment inside. The buyer took photos of particular equipment.

22. On February 25, 2014, the same potential buyer re-visited the facility. During this visit, the potential buyer recognized that a significant amount of the electronic controls and other equipment had gone missing since his August 23, 2013 visit to the site.

23. Sometime or times between August 23, 2013 and February 25, 2014, thieves plundered the facility, stealing over 175 items of valuable electronics and

equipment ("the 2014 theft"). Many electronic controls to expensive manufacturing equipment were stolen, rendering some equipment worthless and others significantly devalued.

24. Upon learning of the 2014 theft, Unilever promptly notified JCI. Despite its failure to meet its contractual obligations and prevent the 2014 theft, JCI did nothing to improve security at the facility.

25. Since thieves stole so many of the electronic controls, rendering much of the equipment useless or at a minimum requiring significant maintenance to restore the equipment to a usable state, the 2014 theft precluded Unilever from selling the facility as a turnkey operation. According to one appraisal, the 2014 theft reduced the value of the facility by nearly $3.5 million.

26. The 2014 theft forced Unilever to sell the facility to an industrial auctioneer, rather than as a turnkey operation for a higher price to a third party buyer.

## The 2015 Thefts

27. In 2015, Unilever entered into a contract to sell the facility to Reich Brothers, a firm that acquires distressed assets primarily from industrial manufacturing companies. Reich Brothers specializes in auctioning industrial equipment and manufacturing facilities.

28. Incredibly, while Unilever was under contract with Reich Brothers, more security lapses permitted not one, but two more thefts at the facility.

29. On May 27, 2015 at approximately 6:30 a.m., Unilever discovered the theft of controls from a brand new machine, a Ronchi Bottle Orienter Roto-Bot-2T, serial number 3545RB, made in Italy in 2010 and delivered to the facility in 2011, but never used. The machine was worth approximately $250,000. The thief stole the electronic controls and damaged the machine enough to render it useless.

30. On May 29, 2015, just two days after learning that the facility had been robbed a second time, the facility was robbed yet again. At approximately 6:05 a.m. JCI personnel or contractors witnessed a thief stealing something from the facility. Perhaps even more shocking than the thief's ability to access a facility that was robbed a mere 48 hours earlier was the thief's ability to walk out with the pilfered goods despite being detected by JCI.

31. Because of the May 2015 thefts, Reich Brothers demanded and received, after negotiation, a $400,000 reduction in the purchase price.

32. Thus, because of JCI's failures under the contract causing the multiple thefts, Unilever was damaged approximately $4 million on the sale of the facility.

## COUNT I – BREACH OF CONTRACT

33. Plaintiff hereby incorporates by reference the allegations in paragraphs 1-32 as though fully stated herein.

34. Unilever and JCI had a Contract, pursuant to which, JCI agreed to provide security services at the Alberto Culver facility.

35. JCI knew and understood that Unilever intended to sell the facility as a turnkey operation.

36. At all times Unilever fully performed its obligations under the Contract.

37. Among other things, JCI agreed under the Contract to provide manned security services, monitor the closed circuit television, maintain the security and camera systems, monitor the parking lot, and ensure that the perimeter doors were secure.

38. JCI failed to meet and satisfy the aforementioned obligations and other duties under the Contract. Thus, JCI breached the Contract.

39. JCI's breach of the Contract with Unilever permitted thieves to ransack the facility on multiple occasions.

40. JCI's breach of Contract and the multiple thefts damaged Unilever approximately $4 million. The thefts compromised Unilever's ability to sell the facility as a turnkey operation, thus greatly reducing its value. Moreover, JCI's breach of the Contract and the 2015 thefts caused the ultimate buyer to demand and receive a $400,000 reduction in the purchase price paid for the facility.

WHEREFORE, Plaintiff Unilever United States Inc. respectfully requests that this Court enter judgment in its favor and against Johnson Controls Inc. and order Johnson Controls, Inc. to pay damages in an amount to be determined at trial, attorneys' fees and costs, and any other relief this Court deems fair and just.

          Respectfully submitted,


          By: <u>/s/ Matthew S. Ryan</u>
           Attorney for Plaintiff

Matthew S. Ryan
Terence H. Campbell
Cotsirilos, Tighe, Streicker, Poulos & Campbell, Ltd.
33 North Dearborn Street, Suite 600
Chicago, IL 60602
(312) 263-0345