UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNILEVER UNITED STATES, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>JOHNSON CONTROLS, INC. )<br>)<br>Defendant. ) | Case No. 16-CV-01849<br><br>Judge Joan B. Gottschall |

## MEMORANDUM OPINION AND ORDER

Unilever United States, Inc. ("Unilever") intended to sell a large, industrial facility as a "turnkey operation." (Compl. 1, ECF No. 1.) It contracted with Johnson Controls, Inc. ("JCI") to provide security at the facility, but according to its complaint, JCI did not prevent thefts of expensive electronic controls and other items from the facility. Unilever filed a one-count complaint for breach of contract. It seeks approximately $4 million in damages, which it estimates to be the difference between the price at which it would have sold the facility if the thefts had not occurred and the actual sale price. JCI moves to dismiss the complaint for failure to state a claim upon which relief can be granted, Fed. R. Civ. P. 12(b)(6), contending primarily that Unilever cannot recover the decrease in the facility's market value as general contract damages.

## I. BACKGROUND

**A. General Factual Allegations**

For purposes of deciding the pending motion to dismiss, the court assumes the following facts alleged in the complaint are true and draws all reasonable inferences in Unilever's favor. *See, e.g.*, *Manistee Apts., LLC v. City of Chi.*, 844 F.3d 630, 633 (7th Cir. 2016). JCI and Unilever executed a Master Services Agreement ("MSA") on May 1, 2007. Under the MSA, JCI

1

provides various services at Unilever-owned facilities; "[t]he specific Services to be provided to each applicable facility of [Unilever] shall be detailed on separate Statements of Work to be executed by [JCI] and [Unilever] for each such facility." (Compl. ¶ 10 (quoting MSA) (alterations in original)).

Unilever bought the Alberto Culver Company in May 2010. The acquisition included an 18.7-acre campus and 534,000-square-foot manufacturing facility and offices in Melrose Park, Illinois ("the facility"). (Compl. ¶ 6.) Unilever stopped production at the facility on April 15, 2013, and closed it on May 31, 2013. (*Id*. ¶ 7.) It intended to sell the facility as a "turnkey manufacturing operation." (*Id*. ¶ 8.) On June 1, 2013, Unilever and JCI signed a Statement of Work ("SOW") to be performed at the facility. (*Id*. ¶ 11 & Ex. 2.)

A potential buyer visited the facility in August 2013 and returned for a second visit in February 2014. The potential buyer noticed during his second visit that "a significant amount of the electronic controls and other equipment had gone missing since" his first visit. (Compl. ¶ 22.) Unilever alleges that sometime between those two visits, approximately 175 items were stolen, "rendering some equipment worthless and others significantly devalued." (*Id*. ¶ 23). "Since thieves stole so many of the electronic controls . . . the 2014 theft precluded Unilever from selling the facility as a turnkey operation. According to one appraisal, the 2014 theft reduced the value of the facility by nearly $3.5 million." (*Id*. ¶ 25.) Because of the thefts, Unilever sold the facility to an industrial auctioneer specializing in distressed assets. (*Id*. ¶¶ 26-27.) In 2015, Unilever contracted to sell the facility to Reich Brothers. (*Id*. ¶ 27.)

Two additional thefts occurred on May 27 and 29, 2015, while the facility was under contract for sale. (*See id*. ¶¶ 28–30.) In the first incident, electronic controls were taken from a brand-new machine worth approximately $250,000, rendering it useless. (*Id*. ¶ 29.) "Because of

the May 2015 thefts, Reich Brothers demanded and received, after negotiation, a $400,000 reduction in the purchase price" of the facility.  (*Id*. ¶ 31.)

Unilever alleges that "JCI knew and understood that Unilever intended to sell the facility as a turnkey operation."  (*Id*. ¶ 35.)  The complaint seeks as damages the "approximately $4 million on the sale of the facility" Unilever estimates it lost because JCI did not prevent the thefts.  (*Id*. ¶ 32; *accord. id*. ¶ 40.)

**B. The Master Services Agreement and Statement of Work**

The parties highlight several provisions of the MSA.  The first, § 6.2(d), reads:

> Further, other than pursuant to the Liability Cap Exceptions, neither party shall be liable to the other party, or any [of] its subsidiaries and affiliates, or their respective officers, directors, employees, agents and representatives for punitive, special, exemplary, incidental or consequential damages in connection with or arising out of the Agreement regardless of whether such claim may be based on contract, warranty, tort (including negligence), or strict liability.

(ECF No. 1 Ex. 1 § 6.2(d), p. 8 [hereinafter "MSA"].)  The second, § 7.2, contains a merger clause, and the third a choice-of-law provision:

> <u>7.2 Entire Agreement; Amendment; Waiver</u>. This Agreement and any Exhibit, addenda, amendments or Statements of Work hereto or thereto constitute the entire understanding between the parties with respect to the subject matter hereof and supersede all other understandings and negotiations with respect thereto. This

Agreement and any Statement of Work may be amended only by a writing manually signed by both parties hereto. Any provision of this Agreement may be waived only by a writing manually signed by the party to be charged by such waiver. No course of dealing between the parties shall be effective to amend or waive any provision of this Agreement. In the event of a conflict between the terms and conditions of a specific Statement of Work and the terms and conditions contained in the main body of this Agreement, the terms and conditions contained in the main body of this Agreement shall govern.

. . .

7.11 <u>Governing Law and Disputes</u>. This Agreement and any claim or dispute arising out of, relating to or in connection with this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be governed by and construed in accordance with the laws of the State of New York without giving effect to its conflicts of law principles (other than Section 51401 of the General Obligation Law). If a dispute arises under this Agreement, the parties shall promptly attempt in good faith to resolve the dispute by negotiation for a period of thirty (30) days."

(MSA §§ 7.2, 7.11, pp. 8, 10.)

Section 8.9 of the SOW describes the security work to be performed this way:

> The primary purpose of security is to present a positive and professional security presence at the Facility. This presence includes performing the following duties: ensuring that only authorized individuals are allowed to access the Facility, signing in and directing visitors and delivery personnel, ensuring all established health and safety procedures are adhered to, monitoring and directing all incoming traffic in an expedient and professional manner. Inspections of the parking lots and other perimeter locations are performed. Post orders followed and changes to activities to be approved by Company Site representative.

(ECF No. 1 Ex. 2 at 26 [hereinafter "SOW"].)

## II. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, (2007)); *Katz-Crank v. Haskett*, 843 F.3d 641, 646 (7th Cir. 2016) (quoting *Twombly*, *supra*). A complaint satisfies this standard when its factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56; *see also Atkins v. City of Chi.,* 631 F.3d 823, 832 (7th Cir. 2011) ("[T]he complaint taken as a whole must establish a nonnegligible probability that the claim is valid, though it need not be so great a probability as such terms as 'preponderance of the evidence' connote."); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("[P]laintiff must give enough details about the subject-matter of the case to present a story that holds together."). When deciding a motion to dismiss under Rule 12(b)(6), the court takes all facts alleged by the plaintiff as true and draws all

reasonable inferences from those facts in the plaintiff's favor, although conclusory allegations that merely recite the elements of a claim are not entitled to this presumption of truth. *Katz-Crank*, 843 F.3d at 646 (citing *Iqbal*, 556 U.S. at 662, 663); *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

### III. ANALYSIS

The parties agree that New York contract law governs Unilever's claim under the MSA's choice-of-law clause (MSA ¶ 7.11). *See also LaSalle Bank Nat'l Ass'n v. Paramont Props., LLC*, 588 F. Supp. 2d 840, 849 (N.D. Ill. 2008) ("Since the Note's choice of law clause identifies Illinois law and the parties do not challenge the validity of the clause, the Court will give effect to the choice of law provision."); *Amakua Dev. LLC v. Warner*, 411 F. Supp. 2d 941, 948 (N.D. Ill. 2006). "Under New York law, a breach of contract claim has four elements: "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Fulcrum Fin. Advisors, Ltd. v. BCI Aircraft Leasing, Inc.*, 354 F. Supp. 2d 817, 825 (N.D. Ill. 2005) (quoting *Ledain v. Town of Ontario*, 746 N.Y.S.2d 760, 763 (N.Y. Sup. Ct. 2002)). Unilever moves to dismiss under two provisions of the MSA: § 6.2's language precluding recovery of consequential damages and § 7.11's statement that the parties "shall promptly attempt in good faith to resolve the dispute by negotiation."

**A. The Parties Did Not Contemplate Recovery For A Decrease In The Value Of Real Property From Theft In The MSA Or SOW**

Damages recoverable in a breach-of-contract action generally fall into two categories: "(1) 'general' or 'market' damages; and (2) 'special' or 'consequential' damages." *Schonfeld v. Hilliard*, 218 F.3d 164, 175 (2d Cir. 2000) (citing 3 Dan B. Dobbs, *Law of Remedies* § 12.2(3) (1993)). Section 6.2 of the MSA precludes recovery of consequential damages. New York

courts ordinarily enforce a clause limiting liability for consequential damages unless it is unconscionable. *See, e.g., Kraft v. Staten Island Boat Sales, Inc.*, 715 F. Supp. 2d 464, 476 (S.D.N.Y. 2010) ("a limitation on incidental or consequential damages remains valid even if an exclusive remedy fails" (quoting *McNally Wellman Co. v. N.Y. State Elec. & Gas Corp.*, 63 F.3d 1188, 1197 (2d Cir. 1995)) (other citation omitted)); *Noble Thread Corp. v. Vormittag Assocs., Inc.*, 758 N.Y.S.2d 509, 509 (N.Y. App. Div. 2003) (enforcing unambiguous clause and stating that "[s]uch a limitation of liability is generally enforceable unless the provision is unconscionable" (citing UCC 2–719[3])); *Mom's Bagels of New York, Inc. v. Sig Greenebaum, Inc.*, 559 N.Y.S.2d 883, 885 (N.Y. App. Div. 1990) (citing *Belden–Stark Brick Corp. v. Morris Rosen & Sons*, 331 N.Y.S.2d 59, 61 (N.Y. App. Div. 1972)) (enforcing clause limiting recovery of consequential damages and stating that "[w]e have long held that parties to a commercial contract, absent any question of unconscionability, may agree to limit the seller's liability for damages"). Unilever does not suggest that the MSA's clause precluding the recovery of consequential damages is unconscionable. *See generally Kraft*, 715 F. Supp. 2d at 477 ("Whether the clause is unconscionable is a question of law to be determined by analyzing both the procedure by which the contract was formed and the substantive terms of the agreement." (citing *McNally*, 63 F.3d at 1198)). As such, the court must determine whether Unilever's complaint states a claim for general damages upon which relief can be granted.

As the New York Court of Appeals has remarked, "[t]he distinction between general and special contract damages is well defined but its application to specific contracts and controversies is usually more elusive." *Am. List Corp. v. U.S. News & World Report*, 549 N.E.2d 1161 (N.Y. 1989). General damages "naturally and directly [flow from the breach], i.e., in the ordinary course of things, [they] aris[e] from a breach of contract." *Kenford Co. v. Cnty.*

7

*of Erie*, 537 N.E.2d 176,179 (N.Y. 1989) (quoting *Chapman v. Fargo*, 119 N.E. 76, 77 (N.Y. 1918)) (some alterations in original) (other citations omitted). Special damages, by contrast, "are extraordinary in that they do not so directly flow from the breach." *Am. List Corp.*, 549 N.E.2d at 1164. Special damages are available when: "(1) it is demonstrated with certainty that the damages have been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it is established that the damages were fairly within the contemplation of the parties." *Tractebel Energy Mktg. v. AEP Power Mktg.*, 487 F.3d 89, 109 (2nd Cir. 2007) (citing *Kenford Co.*, 493 N.E.2d at 235). When distinguishing between general and circumstantial damages, the "purpose and particular circumstances of the contract" should be considered along with "what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made." *Kenford Co.*, 537 N.E.2d at 179 (citations omitted).

A close reading of Unilever's complaint reveals that it seeks the alleged decrease in the facility's market value rather than lost profits. JCI characterizes the $4 million Unilever seeks as lost profits on the sale of the facility. "Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements." *Tractebel Energy Mktg.*, 487 F.3d at 109. Lost profits can be recovered as general damages, however, where "the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract." *Id.* (citing *Am. List Corp.*, 549 N.E.2d at 1164). "Diminution of value, a backward-looking measure of damages, is fundamentally different from lost profits, a forward-looking measure." *Powers v. Stanley Black & Decker, Inc.*, 137 F. Supp. 3d 358, 386 (S.D.N.Y. 2015). Unilever's complaint does not say that it would have netted an additional $4 million in profits. It alleges that an appraiser estimated that the 2014

8

thefts diminished the facility's value by approximately $3.5 million and that Reich Brothers negotiated a $400,000 reduction in the facility's purchase price after learning of the 2015 thefts. The complaint does not hint at how Unilever measured the facility's value when acquiring it or how it figured the margin on the sale. For all that can be determined from the complaint, Unilever could have recorded the facility's sale as a loss with or without the change in appraised and realized sale price it attributes to the thefts, but it nevertheless wants the full value of the change in market price. That is, Unilever claims damages for the alleged diminution in the market value of the facility as a whole, not its lost profits on the sale of the facility (though they may be the same). *See Powers*, 137 F. Supp. 3d at 386–87 (holding difference between market value of asset as warranted at time of sale and its actual value at time of sale could be recovered as general damages for diminution in its value).

As an initial matter, the complaint alleges that Unilever contracted with JCI with the intent to maximize the value of the facility and that JCI knew that it intended to sell the facility. (*See* Compl. ¶¶ 8, 35.) JCI maintains those allegations should be disregarded as too conclusory. Regardless of whether those allegations are conclusory, JCI's awareness that Unilever intended to sell the facility, "in and of itself, is insufficient, as a matter of law, to impose liability on [JCI] for the loss of [market value] in the value of [the facility]" even as special damages. *Kenford Co.*, 537 N.E.2d at 179 (holding party's knowledge insufficient to make appreciation in value part of special damages). To obtain special damages (and the MSA precludes them), Unilever must go beyond a showing that JCI knew what it intended to do and demonstrate that JCI "contemplated at the time of the contract's execution that it assumed legal responsibility for these damages upon a breach of the contract." *Id.* (citing *Booth v. Spuyten Duyvil Rolling Mill Co.*, 60 N.Y. 487, 494, (1875) for the rule that "bare notice of special consequences which might result

9

from a breach of contract, unless under such circumstances as to imply that it formed the basis of the agreement, would not be sufficient [to impose liability for special damages]" (alteration in original)) (other citations omitted).

Next, Unilever argues that a straightforward application of the rule that "[a] party injured by breach of contract is entitled to be placed in the position it would have occupied had the contract been fulfilled according to its terms" is all that is required to conclude that it seeks general damages. *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007) (citing *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 384 (2d Cir. 2006)). Had JCI performed, reasons Unilever, it would have been in a position to sell the facility for approximately $4 million more than it ultimately did. Unilever's analysis runs into the "well established principle that contract damages are measured at the time of the breach." *Merrill Lynch*, 500 F.3d at 186 (citing *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990) (other citation omitted)). Unilever alleges no breaching conduct on the day it sold the facility. Instead, it pleads that JCI breached the contract before the sale. It computes damages by estimating how those thefts changed the price at which it sold the facility. As the sale of the facility is a collateral transaction to the MSA and SOW, these are ordinarily special damages unless the diminution in the facility's value is the direct and probable consequence of JCI's security lapses. *See Tractable Energy Mktg.*, 487 F.3d at 109 (explaining that "the profits from potential collateral exchanges" are ordinarily special damages).

Unilever analogizes the MSA and SOW to contracts to purchase real estate or make improvements to it.[1] In *12 Baker Hill Road, Inc. v. Miranti*, 14 N.Y.S.3d 787 (N.Y. App. Div.

---

[1] Unilever also cites *Sommer v. Fed. Signal Co.*, 593 N.E.2d 1365 (N.Y. 1992). That case arose form a fire alarm monitoring company's delay in calling the fire department. *See id.* at 549. The contract include a clause limiting the company's liability, and the New York Court of Appeals ultimately held that the plaintiff's claims sounded in tort,

2015), for instance, a contract for sale of real property allowed the buyer to occupy the property before the closing "subject to the condition that she be liable for any damages in the event of her default." *Id*. at 788–89. The sale fell through, and the seller eventually resold it for approximately $40,000 less than the original contract price. *See id*. at 789. The court held that the proper measure of damages was the difference between the contract price and the property's fair market value at the time of the breach. *Id*. at 790 (quoting *White v. Farrell*, 987 N.E.2d 244, 245 (N.Y. 2013)). Also, on a claim for defective design or construction of real property, "the appropriate measure of damages is the cost to repair the defects or, if the defects are not remediable, the difference in value between a properly constructed structure and that which was in fact built." *Brushton-Moira Cent. Sch. Dist. v. Thomas Assocs.*, 692 N.E.2d 551, 553 (N.Y. 1998) (citing *Bellizzi v. Huntley Estates, Inc.*, 143 N.E.2d 802, 804 (N.Y. 1957)) (other citation omitted).

But unlike a contract bargaining for the sale of real property at a set price or an improvement to real property, the security portion of the MSA and SOW does not directly contemplate recovery of damages for diminution in the market value of the entire facility flowing from theft. As with lost profits, the parties to a contract must have contemplated the recovery of damages for an asset's diminution in value when the contract was formed before general damages can be recovered. *See, e.g., Reads Co., LLC v. Katz*, 900 N.Y.S.2d 131, 134 (N.Y. App. Div. 2010) (collecting cases and holding husband did not show that diminution damages were contemplated in marital separation agreement). The MSA requires JCI generally to conduct operations "in a manner to avoid the risk of loss, theft, or damage by vandalism, sabotage or any other means to any equipment, materials, work, or other property at each Site."

---

not contract. *See id*. at 549–50, 552–53. Unilever pleads no negligence or gross negligence claim here, so *Sommer* is inapposite.

11

(MSA Ex. A at 12.) This language distinguishes between "equipment" and "the site," and so it most naturally reads in context as referring to items of personal property, such as equipment, at the site rather than the facility and the real property on which it sits as a whole. (*See id*.) The description of maintenance engineering tasks in the MSA directs JCI to "maximize asset value[,] ensure asset protection[,] and provide value for money," but the MSA separately describes security services. (MSA Ex. A at 21; *see also id*. at 22 ("maintain all building fabric to ensure asset protection and no diminution in asset value")). The SOW lists the primary purpose of security services as "to present a positive and professional security presence at the facility." (SOW 8.9) The SOW requires 24/7 coverage, restricting site access, periodic inspections of the perimeter and parking lots; and monitoring of the alarm, card access systems, and closed-circuit televisions. These provisions show that Unilever wanted round-the-clock security, but they do not expressly contemplate making JCI bear the risk of a decrease in the facility's market value occasioned by a security lapse. *See Cornell Holdings, LLC v. Woodland Creek Assocs., LLC*, 882 N.Y.S.2d 586, 588 (N.Y. App. Div. 2009) ("While Woodland Creek's proof certainly established that it was purchasing the property for development and resale purposes, and further that it expected to generate a profit as a result of the transaction, this proof was simply not adequate to demonstrate that the parties contemplated liability for lost future profits in the event of a breach." (citations omitted)). Nor does the fact that the SOW required JCI to prevent unauthorized access bring diminution damages into contemplation, for not every trespasser does serious, or any, damage. *See Reads Co.,* 900 N.Y.S.2d at 134 (holding that diminution in real property's value is not recoverable as general damages where defendant overstayed the expiration of an agreement allowing her to occupy a house).

Because the MSA and SOW do not contemplate recovery of special (a.k.a.

12

circumstantial) damages, this ends the inquiry. As JCI points out, Unilever does not seek any other form of damages in its complaint. (*See* Mem. Supp. Mot. to Dismiss 11 n.2, ECF No. 17.) Hence, the the court has no occasion today to determine whether the MSA and SOW contemplate recovery of the value of replacing or repairing equipment and other items allegedly stolen from the facility as the result of a security lapse.

**B. The Good-Faith Negotiation Clause Is Not A Condition Precedent**

JCI also argues that the complaint fails to state a claim because it includes no allegations showing compliance with the MSA's good-faith negotiation clause (*see* MSA § 7.11, p. 10). JCI asserts that the 30-day-negotiation-clause is "clearly" a condition precedent to suit. (Mem. Supp. Mot. to Dismiss 12, ECF No. 17.)

The court does not find the MSA's language to be so clear. JCI cites a single case in support of its argument; in it, the following clause created a condition precedent to suit: Upon "the occurrence of any Event of Default ... the Lessor may, at its option, declare this Lease to be in default by written notice to such effect given to the Lessee, and at any time thereafter, the Lessor may exercise one or more of the following remedies." *Sauer v. Xerox Corp.*, 5 F. App'x 52, 55 (2d Cir. 2001) (alterations in original) (unpublished). The MSA's negotiation clause uses the mandatory word "shall" and a timeframe for negotiations, but it does not specify what happens after the negotiation period ends, not to mention court action, or say, for instance, that negotiations are the parties' exclusive remedy during the 30-day period. Cases finding an obligation to negotiate to be a condition precedent typically spell out explicitly what can happen after negotiations—court action or arbitration, for instance. *See id.* (stressing that under the clause, before "proceeding with court action, the lessor must declare the lease to be in default by written notice"); *Egol v. Egol*, 503 N.Y.S.2d 726, 728 (N.Y. App. Div. 1986) (describing as

13

condition precedent to arbitration clause that read: "the parties shall negotiate a modification of his obligations, consistent with their then financial circumstances. On a failure of the parties to agree upon such a modification, either party may submit such dispute to arbitration. . ."); *CanWest Global Commc'ns Corp. v. Mirkaei Tikshoret Ltd.*, 804 N.Y.S.2d 549, 553-54 (N.Y. Sup. Ct. 2005) (paragraphs one and two of letter agreement stated what the parties "shall negotiate," and agreement then expressly stated what happened "[i]n the event that the parties are unable to satisfy to their mutual satisfaction, the provisions of paragraph 1 and 2 . . . "). "Conditions are not favored under New York law, and in the absence of unambiguous language, a condition will not be read into the agreement." *Ginett v. Computer Task Grp., Inc.*, 962 F.2d 1085, 1099–1100 (2d Cir. 1992). The ambiguity in the MSA's "shall negotiate" clause here appears to express at most a promise in the hope of avoiding litigation but not a condition precedent to it. *See Bulgartabac Holding AD v. Republic of Iraq* 451 F. App'x 9, 11 (2d Cir. 2011) (unpublished) (holding language calling for "amicable resolution" of disputes did not create condition precedent to suit and reasoning that the "absence [of conditional language] is probative of the parties' intention that a promise be made rather than a condition imposed" (quotation omitted) (alteration in original)).

The court reaches the conclusion that the negotiation clause does not create a condition precedent only tentatively, for Unilever does not take up the cause of arguing that the clause is not a condition precedent in its response. Instead, Unilever attaches several exhibits to its response purportedly showing its efforts to negotiate, but the court cannot consider them without converting the instant motion into one for summary judgment. *See* Fed. R. Civ. P. 12(d). JCI suggests in its reply that the court grant Unilever leave to amend its complaint to plead compliance with the negotiation clause. This raises a question about how much Unilever must

14

plead. Federal Rule of Civil Procedure 9(c) provides that: "[i]n pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed. But when denying that a condition precedent has occurred or been performed, a party must do so with particularity." Fed. R. Civ. P. 9(c). Based on Rule 9(c), courts in this district have held that the Rule 8 pleading standard enunciated in *Twombly* and *Iqbal*, *supra*, does not govern pleading compliance with conditions precedent. *See Kmart Corp. v. Footstar, Inc.*, No 09 C 3607, 2010 WL 1541296, at *4–5 & n.33 (N.D. Ill. Apr. 14, 2010) (collecting cases in footnote and holding that the following allegation sufficiently pleaded satisfaction of conditions precedent: "[a]ll of the conditions precedent to coverage provided in the Policy have been complied with. In the alternative, [defendant] has waived compliance with all conditions precedent and/or is estoped [sic] from asserting or relying on the conditions precedent in the Policy") (first alteration in original). Unilever's complaint does not include even a general allegation that conditions precedent have occurred, so the court would not need to decide whether Rule 8 pleading standards apply, even if the clause were a condition precedent.

Given JCI's acquiescence in allowing Unilever to amend the complaint and the fact that the condition-precedent issue has not been fully developed in the parties' briefing, the court will grant Unilever leave to amend, if it wishes, to address the negotiation clause and anything else it deems appropriate. *See* Fed. R. Civ. P. 15(a)(2); *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 518 (7th Cir. 2015) (noting "the presumption in favor of giving plaintiffs at least one opportunity to amend" (citing *Luevano v. Wal–Mart Stores, Inc.*, 722 F.3d 1014, 1024 (7th Cir. 2013))). The parties remain free to revisit the question of whether the negotiation clause is a condition precedent later in this litigation.

15

## IV. CONCLUSION

For the foregoing reasons, JCI's motion to dismiss the complaint (15) is granted. Unilever may amend its complaint by 03/08/17. A status conference is set for 03/15/17 at 9:30 a.m.


Date: February 15, 2017                             /s/
                                            Joan B. Gottschall
                                            United States District Judge