IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNILEVER UNITED STATES, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16-CV-01849 |
| | ) | |
| JOHNSON CONTROLS, INC., | ) | |
| | ) | Jury Demanded |
| Defendant. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff UNILEVER UNITED STATES, INC. ("Unilever"), through its attorneys, COTSIRILOS, TIGHE, STREICKER, POULOS & CAMPBELL, and for its FIRST AMENDED Complaint against Defendant, JOHNSON CONTROLS, INC. ("JCI") states the following:

## NATURE OF THE ACTION

1. Unilever brings this breach of contract action against JCI for JCI's utter failure to meet its obligations under a June 1, 2013 Scope of Work and April 1, 2007 Master Services Agreement (collectively "the Contract") between the parties. Under the Contract, Unilever paid JCI approximately $52,968 per month to provide security and other services at the shuttered Alberto Culver Company campus in Melrose Park, IL while Unilever tried to sell the facility and equipment inside. JCI fell woefully short of its obligations under the Contract, and as result, the facility was ransacked at least three times – twice after JCI was fully aware of the first theft. Thieves stole over a million dollars worth of equipment and tools, crippling

Unilever's ability to sell the facility as a turnkey operation, and causing Unilever millions of dollars in damages.

## PARTIES

2. Plaintiff Unilever is a consumer products company based in Englewood Cliffs, New Jersey. At all relevant times, Unilever owned the Alberto Culver Company campus in Melrose Park, IL.

3. Defendant, Johnson Controls Inc., is a diversified technology and industrial company with over 1,300 locations and 130,000 employees worldwide. JCI is headquartered in Milwaukee, Wisconsin. At all relevant times, JCI conducted business in the Northern District of Illinois.

## JURISDICTION AND VENUE

4. The Court has jurisdiction over this matter under 28 U.S.C. §1332 as there is complete diversity among the parties and the amount in controversy exceeds $75,000. 28 U.S.C. §1332(a)(1).

5. Venue lies in this District, as all the events or omissions giving rise to the claims occurred in this District. 28 U.S.C. §1391(b)(2).

## FACTS

6. In 2010, Unilever acquired the Alberto Culver Company. With the purchase, Unilever also acquired Alberto Culver's 18.7-acre campus and 534,000 square foot manufacturing facility and offices, located at 2525 Armitage Ave. in Melrose Park, Illinois (the "facility").

7. On April 15, 2013, Unilever stopped production at Alberto Culver, and six weeks later, on May 31, 2013, Unilever fully closed the facility in Melrose Park.

8. In order to maximize the facility's resale value, Unilever planned to sell it as a turnkey manufacturing operation. The facility housed millions of dollars in industrial equipment, machines, tools, electronics, and systems. Therefore, to keep the facility and its contents secure and the value of its assets preserved during the listing and sale process, Unilever hired JCI to provide security services.

9. According to its website, JCI serves 30% of Fortune 1000 companies and is "responsible for advanced security solutions in over 1 billion square feet of commercially leased property."

10. Since 2007, Unilever has had a Master Services Agreement ("MSA") with JCI under which JCI provides security and other services to various Unilever facilities. Per the MSA, "[t]he specific Services to be provided to each applicable facility of [Unilever] shall be detailed on separate Statements of Work to be executed by [JCI] and [Unilever] for each such facility." (Ex. 1, MSA between Unilever and JCI).

11. On June 1, 2013 the parties executed a Statement of Work ("SOW") applicable to the Alberto Culver facility. (Ex. 2, SOW between Unilever and JCI for 2525 W. Armitage, Melrose Park, IL.)

12. Among other duties, the SOW required JCI to provide Manned Guarding. (Ex. 2, SOW at §8.9). Section 8.9 of the SOW provides:

**Work Statement**

3

> **Includes:** The primary purpose of security is to present a positive and professional security presence at the Facility. This presence includes performing the following duties: ensuring that only authorized individuals are allowed to access the Facility, signing in and directing visitors and delivery personnel, ensuring all established health and safety procedures are adhered to, monitoring and directing all incoming traffic in an expedient manner. Inspections of the parking lots and other perimeter locations are performed....

(Ex. 2, SOW at pg. 26).

13. The following tasks were explicitly included as "Expected Program Elements":

- 24/7 coverage, 1st shift, 2nd shift, and 3rd shift.
- Perimeter door control and lockdown as directed.
- Monitor alarm, card access and CCTV system.
- Once per shift physical check of perimeter doors to ensure they are secure.
- Once per shift physical check of office area doors to ensure they are secure {performed after normal working hours}.
- Monitor employee parking lot.
- Provide training for all new guards.

(Ex. 2, SOW at pp. 26-27).

14. In addition, JCI was required to "insure that all equipment [was] in safe working order, and presents no danger to [Unilever's] property." (Ex. 2, SOW at pg. 7). Specifically, the contract required JCI to maintain "all components and structures associated with Site door systems." (*Id.* at §3.3, pg. 12).

4

15. Section 7.1, Camera Monitoring and Recording System, required JCI to maintain "all components associated with the site camera monitoring and recording system." (*Id.* at §7.1, pg. 24).

16. JCI never even checked the alarm system for operability upon taking over responsibility for securing the facility.

17. JCI did nothing to ensure that the camera monitoring and recording system was operating properly. In fact, several cameras were inoperable, and many of the guards JCI assigned to the site had no idea how to operate the cameras.

18. JCI failed to secure the perimeter doors, permitting thieves to gain access to the facility and make off with the equipment inside.

19. Further, JCI failed to properly and regularly patrol the premises.

20. Despite its contractual obligations and instructions from the local police to monitor and secure the parking lots, JCI did nothing to prevent trespassers and vagrants from accessing the parking lots and thereby accessing the facility.

### **The 2014 Theft**

21. On August 23, 2013, a potential buyer toured the facility to view the grounds and equipment inside. The buyer took photos of particular equipment.

22. On February 25, 2014, the same potential buyer re-visited the facility. During this visit, the potential buyer recognized that a significant amount of the electronic controls and other equipment had gone missing since his August 23, 2013 visit to the site.

5

23. Sometime or times between August 23, 2013 and February 25, 2014, thieves plundered the facility, stealing over 175 items of valuable electronics and equipment and damaging or destroying many other equipment, machines, tools, electronics, and systems ("the 2014 theft"). For example, many electronic controls to expensive manufacturing equipment were stolen, rendering some equipment worthless and others significantly damaged and/or inoperable.

24. Upon learning of the 2014 theft, Unilever promptly notified JCI. Despite its failure to meet its contractual obligations and prevent the 2014 theft, JCI did nothing to improve security at the facility.

25. Since thieves stole so many of the electronic controls, rendering much of the equipment, machines, tools, electronics, and systems unusable and/or inoperable, requiring replacement, or at a minimum requiring significant repairs and maintenance to restore those items to a usable state, the 2014 theft precluded Unilever from selling the facility as a turnkey operation. According to one appraisal, the 2014 theft reduced the value of the facility by nearly $3.5 million. Repairing and replacing all the damaged and stolen equipment, machines, tools, electronics, and systems would have cost Unilever millions of dollars.

26. The 2014 theft forced Unilever to sell the facility to an industrial auctioneer, rather than as a turnkey operation for a higher price to a third party buyer.

## The 2015 Thefts

27. In 2015, Unilever entered into a contract to sell the facility to Reich Brothers, a firm that acquires distressed assets primarily from industrial manufacturing companies. Reich Brothers specializes in auctioning industrial equipment and manufacturing facilities.

28. Incredibly, while Unilever was under contract with Reich Brothers, more JCI security lapses permitted not one, but two more thefts at the facility.

29. On May 27, 2015 at approximately 6:30 a.m., Unilever discovered the theft of controls from a brand new machine, a Ronchi Bottle Orienter Roto-Bot-2T, serial number 3545RB, made in Italy in 2010 and delivered to the facility in 2011, but never used. The machine was worth approximately $250,000. The thief stole the electronic controls and damaged the machine enough to render it useless.

30. On May 29, 2015, just two days after learning that the facility had been robbed a second time, the facility was robbed yet again. At approximately 6:05 a.m. JCI personnel or contractors witnessed a thief stealing something from the facility. Perhaps even more shocking than the thief's ability to access a facility that was robbed a mere 48 hours earlier was the thief's ability to walk out with the pilfered goods despite being detected by JCI.

31. Because of the May 2015 thefts, Reich Brothers demanded and received, after negotiation, a $400,000 reduction in the purchase price.

32. Thus, JCI's multiple breaches of the contract permitted multiple thefts, damaged Unilever millions of dollars in stolen and damaged equipment, machines, tools, electronics, systems, and other items.

**Unilever's Good Faith Attempt to Resolve This Dispute Prior to Litigation**

33. Section 7.11 of the MSA provides that "If a dispute arises under this Agreement, the parties shall promptly attempt in good faith to resolve the dispute by negotiation for a period of thirty (30) days." (Ex. 1, MSA at §7.11, p. 10).

34. Unilever promptly attempted to resolve this dispute with JCI through negotiation for a period exceeding 30 days.

35. Unilever communicated with "claims counsel" for JCI, Ian Botnick, throughout the spring and summer of 2014. (Ex. 3, August 7, 2014 letter from attorney Botnick). Mr. Botnick referred Unilever to JCI's subcontractor's insurers, rather than negotiating directly with Unilever. Discussions with the two insurance companies resulted in a rejection of claims.

36. Next, after the May 2015 thefts, Unilever again timely notified JCI's in-house claims counsel, Mr. Botnick. Mr. Botnick again referred Unilever to two insurers for JCI's subcontractors, stating that JCI has "a captive insurance program so it's handled in-house up to a certain limit, which this claim does not meet." (Ex. 4, June 12, 2015 10:25 a.m. email from Botnick to Cavaliere).

37. Again on July 1, 2015, Botnick told Cavaliere that JCI has "a captive program. None of these losses will trigger our excess, so notice has been sent to our excess insurers. You can consider JCI's "insurer" on notice." (Ex. 5, Email from

8

Botnick to Cavaliere, July 1, 2015). Finally, on August 5, 2015, despite having received sufficient information related to the claims and damages alleged, JCI told Unilever that "based on the limited information provide [sic] and the alleged damages, there's nothing we could offer to adequately compensate Unilever for the thefts." (Ex. 6, August 5, 2015 2:54 p.m. Email from Botnick to Ozer).

38. After JCI completely ignored efforts to negotiate a resolution with Unilever's in-house counsel, Unilever retained an outside attorney. On September 18, 2015, Unilever's attorney sent a demand letter to JCI and its subcontractors' insurers attaching an appraisal that provided the basis for the damages related to the 2014 thefts. (Ex. 7, September 18, 2015 letter from Ryan to Cole, Botnick, Marek). JCI did not respond until October 29, 2015, and at that time, rather than engaging in any negotiations with Unilever, simply asked permission to forward the appraisal to one of the subcontractor's insurers. (Ex. 8, October 29, 2015 email from Botnick to Ryan).

39. On November 25, 2015, after hearing nothing further from JCI and understanding that JCI had no intention of negotiation a resolution of this matter in good faith, Unilever sent another demand letter with a draft complaint attached. (Ex. 9, November 25, 2015 letter from Ryan to Botnick). JCI responded by refusing to accept service of the complaint, and asking for the exact closing date on Unilever's sale to Reich Brothers. (Ex. 10, November 30, 2015 emails from Botnick to Ryan). Unilever provided that information to JCI but never received a single

substantive response to its demand, demonstrating again that JCI never intended to negotiate or resolve this matter in good faith.

40. Finally, on February 2, 2016, Unilever filed this action, after having wasted seven months trying to obtain a substantive response from JCI to resolve the millions of dollars of damages Unilever had suffered because of JCI's multiple breaches of contract. In sum, Unilever attempted in good faith to negotiate a resolution of this suit for more than thirty days before filing suit, thereby performing and satisfying any conditions precedent to suit. However, JCI did not reciprocate, and never once substantively responded to Unilever's communications.

## **COUNT I – BREACH OF CONTRACT**

41. Plaintiff hereby incorporates by reference the allegations in paragraphs 1-41 as though fully stated herein.

42. Unilever and JCI had a Contract, pursuant to which, JCI agreed to provide security services at the Alberto Culver facility.

43. JCI knew and understood that Unilever intended to sell the facility as a turnkey operation.

44. At all times Unilever fully performed its obligations under the Contract, including but not limited to satisfying any and all conditions precedent to bringing this lawsuit.

45. Among other things, JCI agreed under the Contract to provide manned security services, monitor the closed circuit television, maintain the security and

camera systems, monitor the parking lot, and ensure that the perimeter doors were secure.

46. JCI failed to meet and satisfy the aforementioned obligations and other duties under the Contract. Thus, JCI breached the Contract.

47. JCI's breach of the Contract with Unilever permitted thieves to ransack the facility on multiple occasions.

48. JCI's multiple breaches of Contract and the multiple thefts damaged Unilever millions of dollars in stolen and damaged equipment, machines, tools, electronics, systems, and other items.

49. In addition, the thefts compromised Unilever's ability to sell the facility as a turnkey operation, thus greatly reducing its value. Moreover, JCI's breach of the Contract and the 2015 thefts caused the ultimate buyer to demand and receive a $400,000 reduction in the purchase price paid for the facility. The diminution of value of the facility was a direct and probable consequence of JCI's multiple security lapses.

50. All the aforementioned damages have been caused by JCI's breaches of Contract; the extent of the losses are provable with reasonable certainty; and all the aforementioned damages were fairly within the contemplation of the parties.

WHEREFORE, Plaintiff Unilever United States Inc. respectfully requests that this Court enter judgment in its favor and against Johnson Controls Inc. and order Johnson Controls, Inc. to pay damages in an amount to be determined at trial, attorneys' fees and costs, and any other relief this Court deems fair and just.

Dated:   March 8, 2017                              Respectfully submitted,


                                                    By: /s/ Matthew S. Ryan
                                                          Attorney for Plaintiff

Matthew S. Ryan
Terence H. Campbell
Cotsirilos, Tighe, Streicker, Poulos & Campbell, Ltd.
33 North Dearborn Street, Suite 600
Chicago, IL 60602
(312) 263-0345

**CERTIFICATE OF SERVICE**

Matthew S. Ryan, an attorney, certifies that on March 8, 2017, in accordance with the Local Rules on ECF filings, the following document:

Plaintiff's First Amended Complaint

was served on opposing counsel through the District Court's ECF system.

<u>*/s/ Matthew S. Ryan*</u>