UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNILEVER UNITED STATES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 16-CV-01849 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| JOHNSON CONTROLS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Unilever United States, Inc. ("Unilever"), sued Johnson Controls, Inc. ("JCI") for breach of a contract to provide, among other things, security service at a commercial facility located in Melrose Park, Illinois ("the Melrose Park facility" or "the facility"). Unilever claims that thieves made off with electronic controls and other expensive items between August 2013 and May 29, 2015. In its original complaint, as construed by the court in its memorandum opinion and order dated February 15, 2017 ("the February 2017 opinion"), Unilever sought "the alleged decrease in the facility's market value" in damages. *Unilever U.S., Inc. v. Johnson Controls, Inc.*, No. 16-CV-01849, 2017 WL 622209, at *4 (N.D. Ill. Feb. 15, 2017) ("*Unilever I*").

In the February 2017 opinion, the court ruled that the parties' contract precluded recovery of consequential or special damages. *Id.* at *3. Moreover, the court ruled that under New York law, which governs this dispute, an alleged diminution in the Melrose Park facility's market value, allegedly caused by breaches of defendant's contractual obligation to provide adequate security services, is not recoverable, since a diminution in the facility's value is not a direct and probable consequence of JCI's security lapses. *See id.* at *4–6. Indeed, nothing in the security portion of the parties' MSA (Master Services Agreement) or SOW (Statement of Work)

(hereinafter together "contract") talks about preserving market value or contemplates recovery of damages for the facility's diminution in market value as a result of theft. *Id.* at *5. New York law makes clear that the parties to a contract must have contemplated the recovery of damages for an asset's diminution in value when the contract was formed before such damages can be recovered. *See id.*

Now, in an Amended Complaint ("FAC", ECF No. 27), plaintiff Unilever has included *two* paragraphs describing its damages. JCI again moves to dismiss the FAC for failure to state a claim upon which relief can be granted.[1]

Paragraph 49, which appears to seek recovery of the $400,000 diminution of the value of the facility Unilever realized in its sale, appears to be precisely the damages that the court held in the February 2017 opinion were consequential or special and not recoverable. Unilever's inclusion of this paragraph is baffling. If it thinks it needs to replead an allegation that the court previously dismissed to preserve the issue, it is simply wrong. "[D]ismissed claims need not be included in an amended complaint, because the final judgment brings up all previous rulings in the case." *Smith v. Nat'l Health Care Servs. of Peoria*, 934 F.2d 95, 98 (7th Cir. 1991) (citing *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 682–83 (7th Cir. 1990)); *accord Gavin v. AT & T Corp.*, No. 01 C 2721, 2003 WL 22849128, at *4 (N.D. Ill. Dec. 1, 2003) (quotation and citations omitted) ("the Seventh Circuit has made clear, time and again, that a litigant need not replead dismissed claims to preserve them for appeal"). The damages described in paragraph 49 were the subject of the court's previous order and pursuant to the parties' contract and New York law, they are not recoverable. *Unilever I*, 2017 WL 622209, at *4–6. Paragraph 49 will therefore be dismissed.

---

[1] The court recited the standard governing motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) in the February 2017 opinion. *See Unilever I*, 2017 WL 622209, at *3.

The damages described in paragraph 48, however, were not the subject of the court's prior order. In paragraph 48, Unilever seeks to recover damages for the equipment, machines, tools, electronics and other items damaged as a result of the security breaches allegedly caused by JCI's failure to perform its obligations under the parties' contract.

Citing Justice Cardozo's opinion in *Kerr Steamship Co. v. Radio Corp. of America*, 157 N.E. 140 (N.Y. 1927), JCI argues that repair or replacement costs for equipment damaged by theft are also consequential damages and not recoverable under the contract. In *Kerr*, the plaintiff delivered to the defendant a telegram consisting of twenty-nine words in cipher (code) to be transmitted to Manila in the Philippine Islands. *Id.* at 140. Its purpose was to provide instructions for the loading of a ship. *Id.* For various complex reasons, the telegram was not delivered, and because the telegram was not delivered, the cargo was not loaded and the freight was lost. *Id.* at 141. Importantly, for the court however, the telegram delivered to defendant was in cipher, and its subject was therefore not apparent. *Id.* The court held that while it might be inferable that the telegram related to business of some sort, beyond that it meant nothing, and defendant could not have foreseen the effect of its non-delivery. For this reason, following the rule of *Hadley v. Baxendale*, (1854) 156 Eng. Rep. 145; 9 Ex. 341, defendant's liability was limited either to nominal damages or the cost of carriage if tolls had been prepaid. A telegram in cipher failed to give defendant adequate notice of the risk of failing to perform its contractual obligation. *See Kerr*, 157 N.E. at 141.

*Kerr* is grounded on the difference between general and special damages. The difference, Justice Cardozo emphasized, "is not absolute, but relative." *Id.* In other words, the specific contract at issue determines the classification of the damages that are recoverable. "[D]amage which is general in relation to a contract of one kind may be classified as special in relation to

another." *Id.* In *American List Corp. v. U.S. News and World Report, Inc.*, 549 N.E.2d 1161, 1164 (N.Y. 1989), the New York Court of Appeals essentially agreed, noting that "[t]he distinction between general and special contract damages is well defined but its application to specific contracts and controversies is usually more elusive." The court defined general and special damages in terms of their relative probabilities of flowing from the breach, general damages being "those which are the natural and probable consequence of the breach" and special damages being extraordinary damages which do not flow "so directly" from the breach. *Id.* (citation omitted); *accord Biotronik, A.G. v. Conor Medsystems Ireland, Ltd.*, 11 N.E.3d 676, 679–81 (N.Y. 2014).

This contract-specific approach to assessing the probability that particular damages will result from a breach can be seen in action in *Biotronik, supra.* Plaintiff, a medical device distributor, and defendant, the developer and manufacturer of CoStar, a coronary stent, entered into an agreement designating plaintiff as the exclusive distributor of CoStar throughout much of the world. *Biotronik*, 11 N.E.3d at 677. The price plaintiff paid defendant reflected the actual sales, and sales price, of the CoStar stents, involving a percentage of direct sales and a different percentage of indirect sales. *Id.* at 678. The contract operated only if plaintiff sold stents and the payment received by defendant bore a direct relationship to the market price plaintiff could obtain. *Id.* The agreement guaranteed to defendant a set number of sales per month, but defendant could cap the number of orders it filled even if plaintiff was ready and able to sell more. *Id.* Based on FDA trials, defendant terminated an FDA application for CoStar and notified plaintiff that it was recalling CoStar and removing it from the worldwide market. *Id.* at 679.

Plaintiff sued defendant for breach of contract, seeking lost profits, which are frequently characterized as consequential damages. *Id.* The agreement, governed by New York law, explicitly excluded recovery for consequential damages. *Id.* The New York Supreme Court held that lost profits in this case were consequential damages, and the Appellate Division affirmed. *Id.*

The Court of Appeals, however, reversed, holding that "damages must be evaluated within the context of the agreement" and that under this exclusive distribution agreement, lost profits should be characterized as general, not consequential, damages. *Id.* The issue, the court said, is whether the nature of the agreement is such that the damages in question—here, lost profits—flow directly from the breach or might reasonably be assumed to have been contemplated by the parties at the time the contract was made. *Id.* at 680. In these cases, lost profits should be viewed as general and not consequential damages. *Id.* Where a contract, such as that in the case at bar, is closer to a joint venture than to an ordinary buyer-seller contract, and where the agreement reflects the building of a business and the creation of a demand for the plaintiff's product, sale profits are not the result of some sort of collateral engagement but are a measure of the value of the contract to the plaintiff. In such a case, lost profits are general, not consequential, damages.

While "foreseeability" is a term used interchangeably (and confusingly) with respect to both general and consequential damages, including by Justice Cardozo in *Kerr*, the *degree of foreseeability* is in modern cases often used to distinguish between the two types of damages. Thus, where damages are "utterly foreseeable, indeed certain" they are considered direct (general) but where they are "reasonably foreseeable," they are consequential. *In re Rust-Oleum Restore Mktg., Sales Prices & Prods. Liab. Litig.,* 155 F. Supp. 3d 772, 792 (N.D. Ill. 2016)

(quoting *Rexnord Corp. v. DeWolff Boberg & Assocs., Inc.*, 286 F.3d 1001, 1004 (7th Cir. 2002));

*see also Rexnord Corp.*, 286 F.3d at 1004 (collecting cases) ("Contract law distinguishes between direct and consequential damages, the difference lying in the degree to which the damages are a foreseeable (that is, a highly probable) consequence of a breach.")

The argument JCI advances, then, is in essence that the loss of equipment from a theft is not a sufficiently foreseeable consequence of breaching its contract with Unilever to provide security services to make the equipment's replacement value recoverable as general damages. *See* Gary Knapp, Annotation, 83 A.L.R.4th 1150 §§ 6–7(b) (1991 & Supp.) Neither Unilever nor JCI cites New York case law addressing how to draw the line between general special damages in contracts for security services: If a contract for a security guard is breached, how foreseeable is the loss of movable stolen equipment (as contrasted from the diminution in the market value of the real property from which it was taken)?

Although the cases are far from clear on what kind of damages they are referring to, there is authority that strongly suggests that the breach of a contract to provide security-guard services allows recovery of losses caused by theft, not recovery merely of the value of the security services performed properly. In *Generale Bank v. Bell Sec., Inc.*, a bank obtained a temporary restraining order preventing a third party, a trading company, from removing property from a warehouse. 741 N.Y.S.2d 198, 199 (N.Y. App. Div. 2002). The same day it obtained the order, the bank hired a security company to post guards to watch the warehouse and make sure none of the inventory was taken. *See id.* (describing fax sent by bank's counsel to security company directing guards to show anyone trying to access the warehouse a copy of the order). Nevertheless, over three quarters of the inventory was gone when the bank later obtained access to the warehouse. *Id.* at 199–200. The bank sued the security company for breach of contract,

and the trial court dismissed the complaint. *Id.* at 200. The New York Court of Appeals reversed, stating:

> It is abundantly clear that defendant provided security services to plaintiff, that property was removed from the premises secured by defendant and that plaintiff was damaged by the loss of its collateral. Under these facts, having actually undertaken performance, defendant would be prima facie liable to plaintiff for breach of contract even in the absence of a writing. The intervention of third parties is immaterial because *such a breach of security is* the immediate consequence of the lapse in security with which defendant is charged.

*Id.* (emphasis added) (citing *McKinnon v. Bell Sec.*, 700 N.Y.S.2d 469 (N.Y. App. Div. 2000)).

*Sandvik, Inc. v. Statewide Security Systems, Division of Statewide Guard Services, Inc.*, 469 A.2d 955 (N.J. Super. Ct. App. Div. 1983) runs in much the same vein. The plaintiff, a manufacturer of tungsten carbide inserts, contracted with defendant, a licensed private detective agency, to provide security guard services. *Id.* at 956. On the occasion in question, defendant's employee, who was guarding the plant, was bribed to leave his post. *Id.* During his absence, 4205 kilograms of tungsten carbide powder were stolen, worth $118,000. *Id.* The trial court awarded damages of $1,994.33, being one-twelfth of the parties' annual contract price, reasoning that the defendant had not been fully informed of the value of the tungsten carbide powder and that the parties, therefore, could not have reasonably intended that defendant's liability for breach of contract should extend to the value of the stolen inventory. *Id.* The appellate court reversed. While it did not speak in terms of general versus consequential damages, it applied the principle that "[t]he only purpose of the contract was to avoid the precise loss suffered," and that the evidence indicated that the contract price was to some extent based on the contract's purpose to avoid inventory loss." *Id.* at 958. While defendant may not have known of the value of the tungsten carbide powder, it knew that the plant contained moveable property and that avoiding internal theft and inventory loss was what the plaintiff was paying for. *Id.* Under these

circumstances, the appellate court ruled, "we find unavoidable the conclusion that the inventory loss of $118,000 was a reasonably foreseeable, natural and proximate consequence of defendant's breach." [2] *Id.*

In the case at bar, one of the purposes for which the parties contracted was for the provision of security services at the Melrose Park facility. The contract specifically requires JCI to provide security services including "suitably trained and qualified security guards for the security coverage of the building . . . [to] ensure the protection of personnel, customers, visitors, property, buildings and land . . . ." (MSA 27, ECF No. 27 Ex. 1.) Thus, securing the premises and the property contained therein appears to have been an explicit objective of the contract, as it was in *Generale Bank* and *Sandvik*.

In light of this authority and the contract's language, the court cannot accept JCI's argument that it never agreed to assume the risk of loss for break-ins and thefts caused by inadequate security at the pleading stage. Obviously, given the contract's exclusion of consequential damages, the question of foreseeability when the parties contracted may be a factual issue appropriate for summary judgment or jury determination. But given the wording of the contract regarding the parties' explicit agreement for security services, Unilever states a plausible claim that repair and replacement damages are recoverable as general damages. *See Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011) (emphasizing that complaint need not establish validity of plaintiff's claim to a degree implied by the phrase "preponderance of the evidence"). In this case, as in many others, "the precise demarcation between direct and

---

[2] Despite JCI's quotation of "consequential damages" language from the *Sandvik* court's description of the *Sandvik* plaintiff's description of its argument, the *Sandvik* court does not distinguish between general and consequential damages, and the court's own language is very close to that generally used in describing general damages. Regardless, *Sandvik* was not decided under New York law, and, while interesting to consider, is not precedential authority in this case. General Bank, discussed and quoted in the text infra, applied New York law, and the court there used language very close to that New York courts use when they speak of general damages.

consequential damages is a question of fact." *Am. Elec. Power Co., Inc. v. Westinghouse Elec. Corp.*, 418 F. Supp. 435, 459 (S.D.N.Y. 1976) (noting that "the commercial context in which a contract is made is of substantial importance in determining whether particular items of damages will fall into one category or the other" (citing *Applied Data Processing, Inc. v. Burroughs Corp.*, 394 F. Supp. 504, 509 (D. Conn. 1975)); *cf. Generale Bank*, 741 N.Y.S.2d at 200 (holding that the extent of security services to be provided and whether the thefts from warehouse resulted from the breach were fact questions). The court cannot determine on the present, undeveloped record what the parties intended or what risks they explicitly discussed. At the pleading stage, reasonable inferences from the facts alleged must be drawn in Unilever's favor. *See, e.g.*, *Katz-Crank v. Haskett*, 843 F.3d 641, 646 (7th Cir. 2016) (citing *Iqbal*, 556 U.S. at 662, 663). Taken together, the contract's language and the FAC's allegations demonstrate that these and other factual issues may well bear on the question of whether the damages Unilever seeks in paragraph 48 are recoverable, and that is enough to survive a motion to dismiss. *See Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (federal pleading standards "'call[] for enough facts to raise a reasonable expectation that discovery will reveal evidence' supporting the plaintiff's allegations" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007))).

Finally, JCI suggests that Unilever's allegation in paragraph 25 of the FAC of what repairing or replacing the damaged equipment would have cost dooms its request for damages because it does not plead that it actually repaired or replaced anything. The court has been unable to find any indication in New York law that a party must effectuate repairs or replacement to be entitled to damages, and JCI directs the court to no authority supporting its position. Rather, it appears that the measure of damages is what it would cost to repair or replace the damaged goods, not whether or not plaintiff actually invested in repair or replacement. *See, e.g.,*

*Olympic Realty, LLC v. Open Road of Staten Island, LLC*, 36 N.Y.S.3d 484, 486–87 (N.Y. App. Div. 2016) (holding that defendants' damage to plaintiff's property, based on what restoring the property to its proper state of repair would have cost, was recoverable as damages even if subsequent tenant demolishes the allegedly damaged fixtures).

\* \* \*

For the reasons stated, Unilever's FAC pleads a plausible claim for the general damages it seeks in paragraph 48. Accordingly, JCI's Motion to Dismiss First Amended Complaint (ECF No. 30) is granted in part and denied in part. Paragraph 49 of the FAC is dismissed; paragraph 48 is not. A status conference is set for August 9, 2017 at 9:30 a.m.


Date: August 2, 2017 _____/s/_____
                                               Joan B. Gottschall
                                               United States District Judge