# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNILEVER UNITED STATES, INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 16-CV-01849 ) |
| JOHNSON CONTROLS, INC., | ) Hon. Joan B. Gottschall ) Judge Presiding ) |
| Defendant. | ) ) |

## CORRECTED[1] ANSWER AND DEFENSES OF JCI TO UNILEVER'S FIRST AMENDED COMPLAINT

Defendant, Johnson Controls, Inc. ("JCI"), through its attorneys, Drinker Biddle & Reath LLP, and for its Answer and Defenses to Unilever's First Amended Complaint states as follows:

1. Unilever brings this breach of contract action against JCI for JCI's utter failure to meet its obligations under a June 1, 2013 Scope of Work and April 1, 2007 Master Services Agreement (collectively "the Contract") between the parties. Under the Contract, Unilever paid JCI approximately $52,968 per month to provide security and other services at the shuttered Alberto Culver Company campus in Melrose Park, IL while Unilever tried to sell the facility and equipment inside. JCI fell woefully short of its obligations under the Contract, and as result, the facility was ransacked at least three times — twice after JCI was fully aware of the first theft. Thieves stole over a million dollars' worth of equipment and tools, crippling Unilever's ability to sell the facility as a turnkey operation, and causing Unilever millions of dollars in damages.

**ANSWER**: JCI admits that the June 1, 2013 Scope of Work and the April 1, 2007 Master Services Agreement, incorporated therein, as amended, formed a part of the contract between the parties (the "Contract"). JCI admits that Unilever paid JCI approximately $52,968 per month for services rendered under the SOW at the shuttered Alberto Culver Company campus in Melrose Park, IL (the "Facility") during the pendency of the Contract. JCI denies the remaining allegations contained in Paragraph 1.

2. Plaintiff Unilever is a consumer products company based in Englewood Cliffs,

---

[1] The missing paragraph numbers in the second through fifth defenses incorporating the prior allegations have been included in this Corrected Answer and Defenses to the First Amended Complaint.

1

New Jersey. At all relevant times, Unilever owned the Alberto Culver Company campus in Melrose Park, IL.

**ANSWER**: JCI lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in Paragraph 2.

3. Defendant, Johnson Controls Inc., is a diversified technology and industrial company with over 1,300 locations and 130,000 employees worldwide. JCI is headquartered in Milwaukee, Wisconsin. At all relevant times, JCI conducted business in the Northern District of Illinois.

**ANSWER**: JCI admits that it is headquartered in Milwaukee, Wisconsin. JCI admits that it conducted business in the Northern District of Illinois. JCI denies the remaining allegations contained in Paragraph 3.

4. The Court has jurisdiction over this matter under 28 U.S.C. §1332 as there is complete diversity among the parties and the amount in controversy exceeds $75,000. 28 U.S.C. §1332(a)(1).

**ANSWER**: JCI lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in Paragraph 4.

5. Venue lies in this District, as all the events or omissions giving rise to the claims occurred in this District. 28 U.S.C. §1391(b)(2).

**ANSWER**: JCI lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in Paragraph 5.

6. In 2010, Unilever acquired the Alberto Culver Company. With the purchase, Unilever also acquired Alberto Culver's 18.7-acre campus and 534,000 square foot manufacturing facility and offices, located at 2525 Armitage Ave. in Melrose Park, Illinois (the "facility").

**ANSWER**: JCI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6.

7. On April 15, 2013, Unilever stopped production at Alberto Culver, and six weeks later, on May 31, 2013, Unilever fully closed the facility in Melrose Park.

**ANSWER**: JCI admits that the Melrose Park Facility was fully closed on May 31, 2013, and

that sometime before then, all production at the Facility had been terminated. JCI lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 7.

8. In order to maximize the facility's resale value, Unilever planned to sell it as a turnkey manufacturing operation. The facility housed millions of dollars in industrial equipment, machines, tools, electronics, and systems. Therefore, to keep the facility and its contents secure and the value of its assets preserved during the listing and sale process, Unilever hired JCI to provide security services.

**ANSWER**: JCI admits that Unilever hired JCI to provide the security services specified in the Contract. JCI denies that Unilever and JCI discussed either the value of the Facility or the value of contents of the facility at the time of the Contract. JCI lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 8.

9. According to its website, JCI serves 30% of Fortune 1000 companies and is "responsible for advanced security solutions in over 1 billion square feet of commercially leased property."

**ANSWER**: JCI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 9.

10. Since 2007, Unilever has had a Master Services Agreement ("MSA") with JCI under which JCI provides security and other services to various Unilever facilities. Per the MSA, "[t]he specific Services to be provided to each applicable facility of [Unilever] shall be detailed on separate Statements of Work to be executed by [JCI] and [Unilever] for each such facility." (Ex. 1, MSA between Unilever and JCI).

**ANSWER**: JCI admits that JCI and Unilever entered into a Master Service Agreement effective April 1, 2007 ("MSA") and that the MSA includes the language quoted in Paragraph 10. JCI denies that the MSA remained unchanged at all relevant times.

11. On June 1, 2013 the parties executed a Statement of Work ("SOW') applicable to the Alberto Culver facility. (Ex. 2, SOW between Unilever and JCI for 2525 W. Armitage, Melrose Park, IL.)

**ANSWER**: JCI admits that the parties executed a Statement of Work applicable to the Alberto Culver Facility, located at 2525 and Armitage, Melrose Park, IL effective June 1, 2013 (the "SOW"). JCI lacks knowledge or information sufficient to form a belief as to the truth of the allegation that Exhibit 2 includes all documents making up the Contract.

12. Among other duties, the SOW required JCI to provide Manned Guarding. (Ex. 2, SOW at §8.9). Section 8.9 of the SOW provides:

> **Work Statement**
>
> **Includes:** The primary purpose of security is to present a positive and professional security presence at the Facility. This presence includes performing the following duties: ensuring that only authorized individuals are allowed to access the Facility, signing in and directing visitors and delivery personnel, ensuring all established health and safety procedures are adhered to, monitoring and directing all incoming traffic in an expedient manner. Inspections of the parking lots and other perimeter locations are performed....

(Ex. 2, SOW at pg. 26).

**ANSWER**: JCI admits that Paragraph 12 quotes a part of a §8.9 of Appendix 1 of the SOW. JCI denies that it failed to provide the Services in accordance with §8.9.

13. The following tasks were explicitly included as "Expected Program Elements":

- 24/7 coverage, 1st shift, 2nd shift, and 3rd shift.
- Perimeter door control and lockdown as directed.
- Monitor alarm, card access and CCTV system.
- Once per shift physical check of perimeter doors to ensure they are secure.
- Once per shift physical check of office area doors to ensure they are secure {performed after normal working hours}.
- Monitor employee parking lot.
- Provide training for all new guards.

(Ex. 2, SOW at pp. 26-27).

**ANSWER**: JCI admits that Paragraph 13 quotes a part of §8.9 of Appendix 1 of the SOW. JCI denies that it failed to provide the Services specified in §8.9.

14. In addition, JCI was required to "insure that all equipment [was] in safe working

4

order, and presents no danger to [Unilever's] property." (Ex. 2, SOW at pg. 7). Specifically, the contract required JCI to maintain "all components and structures associated with Site door systems." *(Id.* at §3.3, pg. 12).

**ANSWER**:   JCI denies that the equipment referenced in the quoted section of the SOW in the first sentence of Paragraph 14 refers to the mothballed manufacturing equipment left in the shuttered Facility. JCI admits that the second sentence of Paragraph 14 quotes a phrase from §3.3 of Appendix 1 to the SOW. JCI denies that it failed to perform the Services specified in §3.3.

15.   Section 7.1, Camera Monitoring and Recording System, required JCI to maintain "all components associated with the site camera monitoring and recording system." *(Id.* at §7.1, pg. 24).

**ANSWER**:   JCI admits that Paragraph 15 quotes a phrase from §7.1 of Appendix 1 to the SOW. JCI denies that it failed to perform the Services specified in §7.1.

16.   JCI never even checked the alarm system for operability upon taking over responsibility for securing the facility.

**ANSWER**:   Denied.

17.   JCI did nothing to ensure that the camera monitoring and recording system was operating properly. In fact, several cameras were inoperable, and many of the guards JCI assigned to the site had no idea how to operate the cameras.

**ANSWER**:   Denied.

18.   JCI failed to secure the perimeter doors, permitting thieves to gain access to the facility and make off with the equipment inside.

**ANSWER**:   Denied.

19.   Further, JCI failed to properly and regularly patrol the premises.

**ANSWER**:   Denied.

20.   Despite its contractual obligations and instructions from the local police to monitor and secure the parking lots, JCI did nothing to prevent trespassers and vagrants from accessing the parking lots and thereby accessing the facility.

5

**ANSWER**: Denied.

21. On August 23, 2013, a potential buyer toured the facility to view the grounds and equipment inside. The buyer took photos of particular equipment.

**ANSWER**: JCI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 21.

22. On February 25, 2014, the same potential buyer re-visited the facility. During this visit, the potential buyer recognized that a significant amount of the electronic controls and other equipment had gone missing since his August 23, 2013 visit to the site.

**ANSWER**: JCI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 22.

23. Sometime or times between August 23, 2013 and February 25, 2014, thieves plundered the facility, stealing over 175 items of valuable electronics and equipment and damaging or destroying many other equipment, machines, tools, electronics, and systems ("the 2014 theft"). For example, many electronic controls to expensive manufacturing equipment were stolen, rendering some equipment worthless and others significantly damaged and/or inoperable.

**ANSWER**: Denied.

24. Upon learning of the 2014 theft, Unilever promptly notified JCI. Despite its failure to meet its contractual obligations and prevent the 2014 theft, JCI did nothing to improve security at the facility.

**ANSWER**: JCI admits that in 2014, Unilever made a claim against JCI alleging that certain components of the unused manufacturing equipment was missing. JCI denies the remaining allegations contained in Paragraph 24.

25. Since thieves stole so many of the electronic controls, rendering much of the equipment, machines, tools, electronics, and systems unusable and/or inoperable, requiring replacement, or at a minimum requiring significant repairs and maintenance to restore those items to a usable state, the 2014 theft precluded Unilever from selling the facility as a turnkey operation. According to one appraisal, the 2014 theft reduced the value of the facility by nearly $3.5 million. Repairing and replacing all the damaged and stolen equipment, machines, tools, electronics, and systems would have cost Unilever millions of dollars.

**ANSWER**: JCI lacks knowledge or information sufficient to form a belief as to the truth of the allegations pertaining to the reduction in the value of the facility shown in one appraisal. JCI denies the remaining allegations contained in Paragraph 25.

26. The 2014 theft forced Unilever to sell the facility to an industrial auctioneer, rather than as a turnkey operation for a higher price to a third party buyer.

**ANSWER**: Denied.

27. In 2015, Unilever entered into a contract to sell the facility to Reich Brothers, a firm that acquires distressed assets primarily from industrial manufacturing companies. Reich Brothers specializes in auctioning industrial equipment and manufacturing facilities.

**ANSWER**: JCI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27.

28. Incredibly, while Unilever was under contract with Reich Brothers, more JCI security lapses permitted not one, but two more thefts at the facility.

**ANSWER**: Denied.

29. On May 27, 2015 at approximately 6:30 a.m., Unilever discovered the theft of controls from a brand new machine, a Ronchi Bottle Orienter Roto-Bot-2T, serial number 3545RB, made in Italy in 2010 and delivered to the facility in 2011, but never used. The machine was worth approximately $250,000. The thief stole the electronic controls and damaged the machine enough to render it useless.

**ANSWER**: JCI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29.

30. On May 29, 2015, just two days after learning that the facility had been robbed a second time, the facility was robbed yet again. At approximately 6:05 a.m. JCI personnel or contractors witnessed a thief stealing something from the facility. Perhaps even more shocking than the thief's ability to access a facility that was robbed a mere 48 hours earlier was the thief's ability to walk out with the pilfered goods despite being detected by JCI.

**ANSWER**: JCI denies the second sentence of Paragraph 30. JCI lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 30.

31. Because of the May 2015 thefts, Reich Brothers demanded and received, after negotiation, a $400,000 reduction in the purchase price.

**ANSWER**: Denied.

32. Thus, JCI's multiple breaches of the contract permitted multiple thefts, damaged Unilever millions of dollars in stolen and damaged equipment, machines, tools, electronics, systems, and other items.

**ANSWER**: Denied.

33. Section 7.11 of the MSA provides that "If a dispute arises under this Agreement, the parties shall promptly attempt in good faith to resolve the dispute by negotiation for a period of thirty (30) days." (Ex. 1, MSA at §7.11, p. 10).

**ANSWER**: JCI admits that Paragraph 33 quotes one sentence from §7.11 of the MSA. JCI denies all remaining allegations contained in Paragraph 33.

34. Unilever promptly attempted to resolve this dispute with JCI through negotiation for a period exceeding 30 days.

**ANSWER**: JCI admits that Unilever made a claim against JCI more than 30 days prior to instituting this action. JCI denies the remaining allegations contained in Paragraph 34.

35. Unilever communicated with "claims counsel" for JCI, Ian Botnick, throughout the spring and summer of 2014. (Ex. 3, August 7, 2014 letter from attorney Botnick). Mr. Botnick referred Unilever to JCI's subcontractor's insurers, rather than negotiating directly with Unilever. Discussions with the two insurance companies resulted in a rejection of claims.

**ANSWER**: JCI admits that Exhibit 3 is a communication from JCI's counsel to American Heritage Protective Services. JCI denies that Paragraph 35 accurately describes JCI's counsel's communications with Unilever counsel. JCI lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 35.

36. Next, after the May 2015 thefts, Unilever again timely notified JCI's in-house claims counsel, Mr. Botnick. Mr. Botnick again referred Unilever to two insurers for JCI's subcontractors, stating that JCI has "a captive insurance program so it's handled in-house up to a certain limit, which this claim does not meet." (Ex. 4, June 12, 2015 10:25 a.m. email from Botnick to Cavaliere).

**ANSWER**: JCI admits that Unilever's counsel and JCI's counsel exchanged emails including those contained in Exhibit 4. JCI denies that Paragraph 36 accurately characterizes the communications contained in Exhibit 4. JCI denies all remaining allegations contained in

Paragraph 36.

37. Again on July 1, 2015, Botnick told Cavaliere that JCI has "a captive program. None of these losses will trigger our excess, so notice has been sent to our excess insurers. You can consider JCI's "insurer" on notice." (Ex. 5, Email from Botnick to Cavaliere, July 1, 2015). Finally, on August 5, 2015, despite having received sufficient information related to the claims and damages alleged, JCI told Unilever that "based on the limited information provide [sic] and the alleged damages, there's nothing we could offer to adequately compensate Unilever for the thefts." (Ex. 6, August 5, 2015 2:54 p.m. Email from Botnick to Ozer).

**ANSWER**: JCI denies that the first sentence of Paragraph 37 accurately quotes the email from JCI's counsel to Unilever's counsel. JCI admits that Exhibit 6 is a copy of a settlement communication from JCI's counsel to Unilever's counsel. JCI denies all remaining allegations contained in Paragraph 37.

38. After JCI completely ignored efforts to negotiate a resolution with Unilever's in-house counsel, Unilever retained an outside attorney. On September 18, 2015, Unilever's attorney sent a demand letter to JCI and its subcontractors' insurers attaching an appraisal that provided the basis for the damages related to the 2014 thefts. (Ex. 7, September 18, 2015 letter from Ryan to Cole, Botnick, Marek). JCI did not respond until October 29, 2015, and at that time, rather than engaging in any negotiations with Unilever, simply asked permission to forward the appraisal to one of the subcontractor's insurers. (Ex. 8, October 29, 2015 email from Botnick to Ryan).

**ANSWER**: JCI denies the allegations contained in the first sentence of Paragraph 38. JCI admits that Exhibit 7 is a copy of Unilever's counsel's September 18, 2015 letter to Everest National Company without the referenced appraisal. JCI admits that Exhibit 8 is an October 29, 2015 settlement communication from counsel for JCI to counsel for Unilever without the referenced report. JCI denies all remaining allegations contained in Paragraph 38.

39. On November 25, 2015, after hearing nothing further from JCI and understanding that JCI had no intention of negotiation a resolution of this matter in good faith, Unilever sent another demand letter with a draft complaint attached. (Ex. 9, November 25, 2015 letter from Ryan to Botnick). JCI responded by refusing to accept service of the complaint, and asking for the exact closing date on Unilever's sale to Reich Brothers. (Ex. 10, November 30, 2015 emails from Botnick to Ryan). Unilever provided that information to JCI but never received a single substantive response to its demand, demonstrating again that JCI never intended to negotiate or resolve this matter in good faith.

**ANSWER**: JCI admits that Exhibit 9 is a copy of Unilever's counsel's November 25, 2015 demand for $4 million without the referenced complaint. JCI admits that Exhibit 10 is a copy of a November 30, 2015 settlement communication from JCI's counsel to Unilever's counsel. JCI denies all remaining allegations contained in Paragraph 39.

40. Finally, on February 2, 2016, Unilever filed this action, after having wasted seven months trying to obtain a substantive response from JCI to resolve the millions of dollars of damages Unilever had suffered because of JCI's multiple breaches of contract. In sum, Unilever attempted in good faith to negotiate a resolution of this suit for more than thirty days before filing suit, thereby performing and satisfying any conditions precedent to suit. However, JCI did not reciprocate, and never once substantively responded to Unilever's communications.

**ANSWER**: JCI admits that Unilever filed this action on February 1, 2016. JCI denies all remaining allegations contained in Paragraph 40.

41. Plaintiff hereby incorporates by reference the allegations in paragraphs 1-41 as though fully stated herein.

**ANSWER**: JCI incorporates by reference its answers to Paragraph 1-41 as though fully stated herein.

42. Unilever and JCI had a Contract, pursuant to which, JCI agreed to provide security services at the Alberto Culver facility.

**ANSWER**: JCI admits that it had a Contract with Unilever to provide specified Services at the Facility as set forth in the Contract of the parties. JCI denies all remaining allegations contained in Paragraph 42.

43. JCI knew and understood that Unilever intended to sell the facility as a turnkey operation.

**ANSWER**: Denied.

44. At all times Unilever fully performed its obligations under the Contract, including but not limited to satisfying any and all conditions precedent to bringing this lawsuit.

**ANSWER**: JCI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 44.

45. Among other things, JCI agreed under the Contract to provide manned security services, monitor the closed circuit television, maintain the security and camera systems, monitor the parking lot, and ensure that the perimeter doors were secure.

**ANSWER**: JCI admits that it agreed to provide specified Services as defined in the Contract.

JCI denies all remaining allegations contained in Paragraph 45.

46. JCI failed to meet and satisfy the aforementioned obligations and other duties under the Contract. Thus, JCI breached the Contract.

**ANSWER**: Denied.

47. JCI's breach of the Contract with Unilever permitted thieves to ransack the facility on multiple occasions.

**ANSWER**: Denied.

48. JCI's multiple breaches of Contract and the multiple thefts damaged Unilever millions of dollars in stolen and damaged equipment, machines, tools, electronics, systems, and other items.

**ANSWER**: Denied.

49. In addition, the thefts compromised Unilever's ability to sell the facility as a turnkey operation, thus greatly reducing its value. Moreover, JCI's breach of the Contract and the 2015 thefts caused the ultimate buyer to demand and receive a $400,000 reduction in the purchase price paid for the facility. The diminution of value of the facility was a direct and probable consequence of JCI's multiple security lapses.

**ANSWER**: Per the August 2, 2017 Order of Court, this Paragraph 49 was stricken.

Accordingly, JCI does not answer this Paragraph 49.

50. All the aforementioned damages have been caused by JCI's breaches of Contract; the extent of the losses are provable with reasonable certainty; and all the aforementioned damages were fairly within the contemplation of the parties.

**ANSWER**: Denied.

WHEREFORE, Defendant, Johnson Controls, Inc., respectfully requests that this Honorable Court dismiss the First Amended Complaint with prejudice, award Johnson Controls, Inc. costs and any other relief this Court deems just and equitable.

**First Defense**
**(Damaged and Missing Components of Manufacturing Equipment**
**Not Direct Damages)**

1. At the time of the Contract, the sprawling 18.7 acre Melrose Park former Alberto Culver manufacturing facility ("Facility") was shuttered and all the manufacturing equipment that was not removed from the Facility had been mothballed.

2. On information and belief, the Facility had already been on the market for over one year and Unilever expected to close a sale of the Facility within six months of the June 1, 2013 Contract date.

3. At the time the parties entered into the Contract, Unilever did not provide JCI with an inventory or other information about the mothballed manufacturing equipment left inside the shuttered Facility.

4. At the time the parties entered into the Contract, the parties did not contemplate that JCI would be liable for the cost to repair or replace missing components of the mothballed manufacturing equipment left in the shuttered Facility.

5. Upon information and belief, at all relevant times Unilever had in place policies of insurance to protect Unilever in the event of a theft or damage to the Facility.

6. On information and belief, Unilever's insurer paid Unilever $2.7 million to cover all losses resulting from the thefts alleged in the First Amended Complaint.

7. Had the parties contemplated that JCI would bear liability for theft of components of the mothballed manufacturing equipment left in the shuttered Facility, the Contract would have specified JCI's responsibility in that regard, which it does not do. Moreover, a description of each piece of mothballed manufacturing equipment, including all components, would have been documented as part of the Contract. This was not done.

8. At the time the parties entered into the Contract, theft or damage to the components of the mothballed manufacturing equipment left in the shuttered Facility was not utterly foreseeable.

9. All the time the parties entered into the Contract theft or damage to the components of the mothballed manufacturing equipment left at the Facility was not reasonably foreseeable.

10. Damages resulting from theft of components of the mothballed manufacturing equipment left in the shuttered Facility are consequential damages not recoverable under §6.2(d) of the MSA incorporated into the Contract.

WHEREFORE, Johnson Controls, Inc. respectfully requests that this Honorable Court dismiss the First Amended Complaint in its entirety with prejudice.

**Second Defense**
**(Limitation on Liability)**

11. JCI incorporates by reference Paragraphs 1-10 above as though fully set forth herein.

12. The Contract limits the parties' liability to each other at 20% of the amounts paid under the Contract to JCI during the Contract Year in which the action giving rise to the liability occurred ("Liability Cap"). MSA §6.2(c). A "Contract Year" for purposes of the Liability Cap is defined as commencing April 1 and ending on March 31. *Id.*

13. The June 1, 2013 to June 16, 2015 period of the Contract include parts of three "Contract Years." However, the allegations of the First Amended Complaint only potentially impact the Contract Year beginning April 1, 2013 and ending on March 31, 2014 (the "2013 Contract Year") and the Contract Year beginning April 1, 2015 and ending March 31, 2016 ("2015 Contract Year"). The allegations of the First Amended Complaint do not allege any

action giving rise to liability in the Contract Year commencing April 1, 2014 and ending March 31, 2015, (the "2014 Contract Year").

14. JCI's liability to Unilever, if any, for the matters alleged in the First Amended Complaint is limited by the Liability Cap defined as 20% of amounts paid to JCI in Contract Years 2013 and 2015.

WHEREFORE, JCI respectfully requests that this Honorable Court enter an order capping JCI's maximum liability to Unilever under the allegations of the First Amended Complaint to no more than 20% of the amounts paid to JCI in Contract Years 2013 and 2015.

## Third Defense
### (Unilever's Own Security Lapses Led to the Alleged Loss)

15. JCI incorporates by reference Paragraphs 1-14 above as though fully set forth herein.

16. On information and belief, based upon witness statements provided by Unilever, including a statement by David Kujawa, Director of Packaging and Equipment Engineering of Unilever, whoever stole the missing components knew exactly what he was looking for, where it was located and was experienced working with that equipment.

17. On information and belief, based upon a statement provided by Unilever, including a statement by Wayne Bieszczat, former Unilever employee, in May 2013 prior to the Contract, when he was passing by the overhead doors near door 2-06 he saw Sean Ryan, former lead Maintenance Technician at Albert Culver/Unilever, pushing a pallet of what appeared to be un-boxed, black computer components stacked one foot high. Bieszczat saw Ryan place the pallet under the stairwell near door 2-06. Bieszczat believed that Ryan had access to all the Facility doors because he was on fire brigade.

18. On information and belief, based upon statements by former Unilever employees, including Nick Mariman, Unilever Human Resources Manager for the Facility, in April 2013 Mariman suspected Sean Ryan was selling items on his eBay site that may have come from the Facility. He was concerned about fifteen items in particular. Mariman stated that Ryan did not turn in any keys when he was terminated and may have kept his identification card. Mariman was aware that Ryan returned to the Facility after he was terminated.

19. The majority of the components missing from the mothballed manufacturing equipment were hidden behind panel doors. In order to determine whether the parts were missing, it was necessary to remove the panels and look inside. On information and belief, no inspection behind the panels was performed on the June 1, 2013 effective date of the Contract.

20. On information and belief, the allegedly missing equipment components were likely already missing as of the June 1, 2013 effective date of the Contract.

21. On information and belief, the equipment components taken from the Facility resulted from Unilever's failure to ensure the return of all keys to the Facility by the terminated employees and to ensure that terminated employees were not allowed to return to the Facility, such as Sean Ryan.

WHEREFORE, Johnson Controls, Inc. respectfully requests that this Honorable Court dismiss the First Amended Complaint in its entirety with prejudice.

**Fourth Defense**
**(Estoppel/Waiver)**

22. JCI incorporates by reference Paragraphs 1-21 above as though fully set forth herein.

23. Upon information and belief, Unilever had been marketing the Facility for over a year as of the June 1, 2013 Contract and Unilever anticipated closing on the sale of the Facility within 6 months.

24. The Contract in this case was a Contract for a three month term with the option to renew for additional three month terms.

25. Unilever did not want to invest capital to upgrade the security systems in place at the Facility in view of the imminence of the sale of the Facility. Unilever requested a caretaker facility management proposal from JCI at the lowest possible cost to Unilever.

26. A full complement of additional security services from JCI to upgrade security systems and enhance security at the Facility was available to Unilever and would have been inserted into the Contract if that was what the parties intended.

27. On information and belief, Unilever did not want to invest in capital improvements to upgrade existing security systems or enhance security services at the Facility due to the short time period before the anticipated sale of the Facility.

28. Unilever waived any potential benefit of an upgraded security system or enhanced security service offered by JCI by virtue of its decision not to purchase those services.

29. Unilever is estopped from claiming the potential benefit of an upgraded security system or enhanced security service after having declined to purchase those services.

30. After each three-month term of the Contract, Unilever renewed the Contract for an additional three month term. Indeed Unilever renewed the Contract at least four times after the March 2014 theft alleged in the First Amended Complaint.

31.     By its actions repeatedly renewing the Contract at least four times after the alleged 2014 theft, Unilever waived any claim that it was not satisfied with the services provided by JCI's at the agreed upon price under the Contract.

WHEREFORE, Johnson Controls, Inc. respectfully requests that this Honorable Court dismiss the First Amended Complaint in its entirety with prejudice.

## Fifth Defense
### (Failure to Mitigate)

32.     JCI incorporates by reference Paragraphs 1-31 above as though fully set forth herein.

33.     On information and belief, Unilever could have replaced the missing components of some or all of the mothballed manufacturing equipment at a cost far below the amount Unilever seeks to recover from JCI in this action.

34.     Unilever made no attempt to replace any of the missing components of the mothballed manufacturing equipment left in the shuttered Facility or otherwise mitigate its alleged damages resulting from the alleged thefts.

WHEREFORE, for the foregoing reasons, Johnson Controls, Inc. respectfully requests that this Honorable Court dismiss the First Amended Complaint in its entirety with prejudice.

## Jury Demand

Johnson Controls, Inc. demands a trial by jury.

Dated: August 16, 2017

        Respectfully Submitted,

        JOHNSON CONTROLS, INC.

        By:    s/ Alan S. King
        Alan S. King, Esq. (ARDC #: 6198223)
        John A. Simon, Esq. (ARDC #:6190503)
        DRINKER BIDDLE & REATH LLP
        191 N. Wacker Drive, Suite 3700
        Chicago, IL  60606-1698
        Phone:  (312) 569-1000
        Fax:  (312) 569-3334
        E-mail:  alan.king@dbr.com
        E-mail:  john.simon@dbr.com

# CERTIFICATE OF SERVICE

Alan S. King, an attorney, certifies that he caused a copy of Defendant's Answer and Defenses of JCI to Unilever's First Amended Complaint to be filed via ECF on August 16, 2017, which will send a copy by electronic means to:

>Matthew S. Ryan
>Emily C.R. Vermylen
>Cotsirilos, Tighe, Streicker, Poulos & Campbell, Ltd.
>33 N. Dearborn Street, Suite 600
>Chicago, IL 60602
>mryan@cotsiriloslaw.com
>evermylen@cotsiriloslaw.com

>s/ Alan S. King

>Alan S. King, Esq. (ARDC #06198223)
>DRINKER BIDDLE & REATH LLP
>191 North Wacker Drive, Suite 3700
>Chicago, Illinois 60606
>Telephone: (312) 569-1000
>Fax: (312) 569-3334
>Alan.king@dbr.com

89815706.3